IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 17-cv-01718-PAB-KLM

DTC ENERGY GROUP, INC., a Colorado Corporation,

    Plaintiff,

v.

ADAM HIRSCHFELD,
JOSEPH GALBAN, and
ALLY CONSULTING, LLC f/k/a WYODAK STAFFING, LLC, a Wyoming limited liability
company,

    Defendants.

---

## ORDER

---

This matter is before the Court on Plaintiff's Amended Motion and Supporting
Memorandum for Preliminary Injunction [Docket No. 25]. The Court has jurisdiction
pursuant to 28 U.S.C. §§ 1331 and 1367.

## I. BACKGROUND

Plaintiff DTC Energy Group initiated this lawsuit on July 14, 2017. Docket No. 1.
On the same day, plaintiff moved for a temporary restraining order and preliminary
injunction based on the alleged misappropriation of plaintiff's trade secrets by
defendants Adam Hirschfeld, Joseph Galban, and Ally Consulting, LLC. Docket No. 4.
After a hearing on the motion on August 1, 2017, the Court denied plaintiff's request for
a temporary restraining order, finding that plaintiff had failed to demonstrate a likelihood
of success on the merits of its misappropriation claims. *See* Docket No. 17 at 69. On
September 13, 2017, plaintiff filed an amended complaint and an amended motion for a

preliminary injunction. Docket Nos. 24, 25. Plaintiff's amended motion seeks injunctive relief against defendants Adam Hirschfeld, Joseph Galban, and Ally Consulting, LLC based on four claims in the amended complaint: (1) misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, and the Colorado Uniform Trade Secrets Act ("CUTSA"), Colo. Rev. Stat § 7-74-101 *et seq.*; (2) breach of contract; (3) breach of the duty of loyalty; and (4) unfair competition. *See* Docket No. 25 at 2, 6-16. After the Court denied Mr. Hirschfeld's Motion to Compel Arbitration and Stay Proceedings [Docket No. 26] on January 4, 2018, *see* Docket No. 37, defendants filed responses to plaintiff's amended motion for a preliminary injunction. Docket Nos. 39, 42. On January 30, 2018, the Court held an evidentiary hearing on plaintiff's motion. Docket No. 56.

## II. FINDINGS OF FACT

The Court makes the following findings of fact based on the parties' filings and the evidence presented at the January 30, 2018 evidentiary hearing:

1. Plaintiff DTC Energy Group, Inc. is a Colorado corporation that provides consulting and staffing services for onshore oil and gas companies in the United States. *See* Docket No. 24 at 3, ¶ 7. The focus of DTC's business is the placement of supervisory personnel, including site supervisors, operations engineers, and project managers, with oil and gas producers. Bob Sylar and Luke Clausen co-owned DTC until May 1, 2017, when Luke Clausen bought Mr. Sylar's equity interest to become sole owner of the company.

2. Defendant Ally Consulting, LLC, is a Wyoming limited liability company that

provides consulting and staffing services for the oil and gas industry. Docket No. 24 at 3, ¶ 10. Ally was formerly known as Wyodak Staffing Services. In 2015, Wyodak was co-owned by Robert Dutton and Joe Johnson. Mr. Clausen testified that the focus of Wyodak's business until at least 2016 was the staffing of directional drillers. Wyodak underwent a name change at some point in late 2015 or early 2016 to become Ally Consulting.

3. Oil and gas staffing firms work primarily with two groups: consultants and customers. "Consultants" are temporary employees hired by the oil and gas companies to work at well sites. "Customers" are the oil and gas companies who hire the consultants. The identities of consultants and customers are generally known by the oil and gas companies. In addition, their identities are readily available through various online sources. James Colvin, the owner/president of Energy First Consulting, testified that there are no exclusivity agreements binding consultants and both consultants and customers often work with multiple staffing firms at any given time.

4. In 2013, DTC hired defendant Adam Hirschfeld as a sales associate. Mr. Hirschfeld was ultimately promoted to the position of business development manager. During his employment with DTC, Mr. Hirschfeld was responsible for assessing the staffing needs of oil and gas companies and identifying appropriate candidates to fill those roles. Mr. Hirschfeld's day-to-day work consisted of recruiting consultants and building and maintaining relationships with oil and gas companies.

5. Mr. Hirschfeld entered into an employment contract with DTC on January 1, 2015. Exhibit 2. Section 11 of contract is a confidentiality provision, which states:

> Employee covenants and agrees that he will not at any time during or

3

after the end of the [employment] Term, directly or indirectly, use for his own account, or disclose to any person, firm or corporation, other than authorized employees of the Company . . . Confidential Information (as hereinafter defined) of the Company.  As used herein, "Confidential Information" of the Company means information about the Company of any kind, nature or description, including but not limited to, any proprietary information, trade secrets, trade values, data, formulae, supplier, client and customer lists or requirements, price lists or pricing structures, marketing and sales information, business plans or dealings and financial information and plans as well as all papers, resumes and records (including computer records) that are disclosed to or otherwise known to Employee as a direct or indirect consequence of Employee's employment with the Company, which information is not generally known to the public or in the businesses in which the Company is engaged.  Confidential information also includes any information furnished to the Company by a third party with restrictions on its use or further disclosure.

Exhibit 2 at 4, ¶ 11.  The contract also contains a nonsolicitation provision.  Subsection

(a) of that provision states:

[W]hile employed by the Company, and for a one-year period thereafter, Employee shall not, directly or indirectly, solicit or influence or attempt to solicit or influence any current customer, client, vendor or supplier of the Company or any of its affiliates or subsidiaries to divert their business to any Competitor . . . of the Company . . . or otherwise terminate its relationship with the Company for any purpose or no purpose, provided, however, that this Section 12 shall not be applicable . . . in the event of a termination of this agreement by the Employee without Good Reason but because there has been a change in the current equity ownership of the Company.

*Id.* at 5, ¶ 12(a).  Subsection (b) further provides:

Employee agrees that, while employed by the Company and for a one-year period thereafter, Employee will not, directly or indirectly, induce, solicit or recruit any employee or consultant of the Company or its subsidiaries or affiliates for the purpose of (A) being employed by Employee or by any Competitor of the Company or (B) interfering with or terminating his or her employment relationship with the Company for any purpose or no purpose.

*Id.*, ¶ 12(b)(ii).  In the event of a breach by the employee, the contract states that DTC

shall have the "right and remedy to have each and every one of the covenants in this

Agreement specifically enforced and the right and remedy to obtain injunctive relief, it being agreed that any breach or threatened breach of any of the confidentiality, nonsolicitation, or other restrictive covenants and agreements contained herein would cause irreparable injury to the Company and that money damages would not provide an adequate remedy at law." *Id.* at 5-6, ¶ 13(a).

6.   In November 2014, DTC hired defendant Joseph Galban as a staff accountant.  There is no evidence that Mr. Galban signed an employment agreement with DTC.

7.   Mr. Hirschfeld and Mr. Galban resigned from DTC on May 31, 2017 and went to work for Ally.  Mr. Hirschfeld currently serves as Ally's head of business development; Mr. Galban works for Ally as an accountant.  Docket No. 24 at 3, ¶¶ 8-9.

8.   In the summer of 2015, Mr. Hirschfeld met with Mr. Dutton and Mr. Johnson at Mr. Sylar's direction regarding a possible business relationship between Wyodak and DTC.  Mr. Sylar testified that Wyodak was not doing well financially.  When Mr. Dutton approached him regarding the possibility of a business relationship between the two companies, Mr. Sylar suggested that DTC could offer Wyodak administrative assistance.  Mr. Sylar had very little involvement in the negotiations after that point and Mr. Hirschfeld took the lead in the negotiations.  On January 11, 2016, Wyodak and DTC entered into a master service agreement ("MSA").  *See* Exhibit K.  The MSA is silent as to the specific services DTC would provide Wyodak.  Mr. Hirschfeld testified that the purpose of the MSA was to allow him to apply his business development efforts to customers at Ally/Wyodak.  However, Matt Meyer and Mr. Clausen testified that the MSA was limited to the provision of administrative services, such as payroll and

benefits. This testimony is corroborated by Mr. Sylar's statement that, when he was approached by Mr. Dutton regarding the possibility of a business relationship, Mr. Sylar suggested that DTC could provide Wyodak with administrative support. The Court finds the testimony of Mr. Meyer, Mr. Clausen, and Mr. Sylar credible. The Court does not find Mr. Hirschfeld's testimony as to the purpose and scope of the MSA credible.

9. Mr. Dutton testified that Mr. Johnson spoke with him about his plans to build a new company – Ally Consulting – with Mr. Hirschfeld, although Mr. Dutton understood Mr. Hirschfeld to be working for DTC at the time. Mr. Meyer testified that Mr. Hirschfeld made strategic decisions on behalf of Ally and was a key player in the company's development. Exhibit 36 further shows that Mr. Hirschfeld was invited to a special members meeting for Ally on November 3, 2016.

10. Mr. Hirschfeld testified that he began selling services to consultants and customers on behalf of both Ally and DTC in January 2016. He further testified that he used DTC's converted resume files to perform work for both companies.

11. On January 1, 2016, Mr. Hirschfeld's father, Craig Hirschfeld, became a 35% owner of Ally. Mr. Hirschfeld admitted that he did not tell Mr. Clausen about his father's ownership interest in the company.

12. In early 2016, Mr. Sylar became suspicious of the relationship between Ally and DTC. After learning that Matt Meyer had opened a bank account on behalf of Ally, Mr. Sylar told Mr. Clausen that he wanted Mr. Meyer out of the company. Mr. Sylar testified that Mr. Clausen did not give him the support that he needed or provide clear information regarding the relationship between DTC and Ally. Mr. Meyer testified that Mr. Clausen took no adverse action against him after learning in July 2016 that Mr.

Meyer had become an equity owner of Ally.

13. On July 11, 2016, Mr. Johnson sent a letter to Mr. Clausen terminating the MSA. Exhibit A-42. The letter stated that Mr. Johnson had "no interest in becoming involved in the ownership dispute" at DTC. *Id.*

14. Following termination of the MSA, DTC employees continued to work on behalf of Ally out of DTC's Denver office. Mr. Hirschfeld testified that, not only was Mr. Clausen aware of the work being performed on behalf of Ally, but Ally was being developed specifically as a "Plan B" for Mr. Clausen in the event that he could not resolve his ownership issues with Mr. Sylar. At the hearing, however, Mr. Clausen denied having any knowledge about his employees' continued efforts to develop Ally. He further testified that he never approved of any plan to develop Ally as a "Plan B." Text messages between Katie Stromstad, Mr. Meyer, Mr. Galban, and Mr. Hirschfeld on July 27, 2016 indicate that DTC employees made an effort to hide their work on behalf of Ally from Mr. Clausen. *See* Exhibit 88 at 107. Mr. Hirschfeld testified that Mr. Clausen specifically instructed him to "keep him out of the loop" regarding Ally so he could "keep [his] hands clean" in his ongoing negotiations with Mr. Sylar. But Mr. Meyer testified that he did not recall any discussions regarding a "Plan B" and was not aware that Mr. Clausen had encouraged the development of Ally. Regarding the text messages sent on July 27, 2016, Mr. Meyer stated that the employees were concerned about Mr. Clausen finding out about their work for Ally because they "hadn't told him about Ally." In light of Mr. Meyer's and Mr. Clausen's testimony, as well as the exhibits presented at the hearing, the Court does not find Mr. Hirschfeld's testimony that Ally was being developed at the direction of Mr. Clausen to be credible.

15.    On May 3, 2017, Mr. Hirschfeld submitted his resignation to Mr. Clausen. Mr. Hirschfeld testified that he did not tell Mr. Clausen that he was going to work for Ally because he was trying to negotiate an agreement with Mr. Clausen to acquire an ownership interest in DTC.  On the same day that Mr. Hirschfeld turned in his resignation, he copied all of the files stored in DTC's Dropbox onto his computer.  He testified it was not uncommon to download files onto his desktop so that he could work remotely.  However, Mr. Hirschfeld could not recall why he downloaded the files on the same day that he turned in his resignation, except that he "felt it important to download" the files at the time.

16.    Between May 3, 2017 and May 31, 2017, Mr. Hirschfeld's final day at DTC, Mr. Hirschfeld copied thousands of converted resumes onto a flash drive, which he took with him when he left DTC.  Mr. Hirschfeld could not recall whether he also took DTC's Excel candidate database, although he stated that he had accessed the database only a few times during his employment with DTC.  With regard to the converted resumes, Mr. Hirschfeld stated that he did not need them for his job at Ally but took them as "a matter of convenience."

17.    Both Mr. Hirschfeld and Mr. Meyer testified that everyone at DTC shared the same password for DTC's Dropbox account.  Mr. Meyer also stated that he was never told that the files in the Dropbox account, including the converted resumes, were confidential.  Mr. Hirschfeld and Mr. Meyer admitted, however, that it could take a DTC employee up to forty-five minutes to convert a resume into the proper format. According to Mr. Hirschfeld, the conversion process involved not only reformatting and editing the resumes, but also sometimes calling consultants to update information in the

resumes.

18.  Mr. Hirschfeld testified that he accessed the converted resume files multiple times in June and July 2017 after leaving DTC, but turned over his computer and USB drives containing the files to Ross Rhinehart, the managing member of Ally, in July or August 2017.  Mr. Rhinehart gave these devices to a third-party forensics company for safekeeping.

19.  Mr. Rhinehart testified that Mr. Hirschfeld still had DTC's Dropbox account on his computer when he began working for Ally, and that Mr. Rhinehart instructed him to delete it.  There is no evidence that Mr. Hirschfeld still has access to the Dropbox account.

20.  Mr. Hirschfeld testified that he did not maintain access to his DTC Outlook database or cell phone contacts following his resignation.

21.  Mr. Hirschfeld admitted to actively soliciting DTC's customers on behalf of Ally while still employed by DTC.  He further admitted that he has continued to solicit DTC's customers since joining Ally.  He claims that such solicitation is permitted under the terms of his employment contract.

## III.  LEGAL STANDARD

To succeed on a motion for a preliminary injunction, the moving party must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Resources*

*Defense Council, Inc.*, 555 US. 7, 20 (2008)); *see Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010)).  "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted).  Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888-89 (10th Cir. 1989), is the "exception rather than the rule."  *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

There are three types of preliminary injunctions that are disfavored in this circuit: (1) injunctions that disturb the status quo, (2) injunctions that are mandatory rather than prohibitory, and (3) injunctions that provide the movant substantially all the relief it could feasibly attain after a full trial on the merits.  *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005).  The "status quo" for purposes of the first category is defined as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing."  *Id.* at 1260 (citing *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001)).  In seeking a disfavored injunction, "the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."  *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (internal quotation marks and brackets omitted); *see also Schrier*, 427 F.3d at 1259 (stating that such injunctions "must be more closely scrutinized to assure that the exigencies of the case support the

granting of a remedy that is extraordinary even in the normal course" (internal quotation marks omitted)).

## IV. ANALYSIS

Plaintiff moves for a preliminary injunction based on four claims asserted in its first amended complaint: (1) misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839, and the Colorado Uniform Trade Secrets Act ("CUTSA"), Colo. Rev. Stat. 7-74-101 *et seq.*; (2) breach of contract; (3) breach of the duty of loyalty; and (4) unfair competition. *See* Docket No. 25 at 6-16. Plaintiff seeks an order enjoining defendants from (1) directly or indirectly contacting, soliciting, attempting to place, or otherwise doing business with the individual candidates, consultants, and oil and gas professionals with whom the individual defendants worked while employed by plaintiff; (2) servicing, contracting with, or accepting any business from any person, firm, business, customer, client, or third-party oil and gas company with whom the individual defendants worked while employed by plaintiff; (3) using, disclosing, or transmitting for any purpose any confidential information and trade secrets belonging to plaintiff that were obtained during Mr. Hirschfeld's and Mr. Galban's employment with plaintiff; and (4) destroying, manipulating, or disposing of any data taken from plaintiff. Docket No. 25 at 2-3. Plaintiff also requests an order requiring the immediate return of all records or documents containing confidential information belonging to plaintiff, requiring Ally to limit the scope of its staffing business to the placement of directional drillers, and prohibiting Mr. Hirschfeld and Mr. Galban from working for Ally pending trial. *Id.*

## A.  Applicability of Heightened Burden

The Court must address, as a threshold matter, whether plaintiff has a heightened burden of showing that the four preliminary injunctive factors weigh in favor of injunctive relief.  The individual defendants argue that a heightened burden applies because the preliminary injunction plaintiff seeks would alter the status quo and afford plaintiff all the relief it could recover at the conclusion of a trial on the merits.  Docket No. 42 at 6.

To determine whether injunctive relief would alter the status quo, the Court looks to the "last uncontested status between the parties which preceded the controversy." *Schrier*, 427 F.3d at 1260.  The status quo is "not necessarily the positions that the parties occupied at the time litigation began."  *Cobra N. Am., LLC v. Cold Cut Sys. Svenska AB*, 639 F. Supp. 2d 1217, 1229 (D. Colo. 2008).  It is also "not defined by the parties' existing *legal rights*," but rather by the "*reality* of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."  *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 (10th Cir. 1991), *overruled on other grounds by O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004).  Applying these standards, the Court finds that the status quo between the parties was the point in time before Mr. Hirschfeld and Mr. Galban began providing services for Ally that exceeded the type of support contemplated by the master service agreement.  *See Cobra N. Am., LLC*, 639 F. Supp. 2d at 1229 (finding that "status quo" was when "License and Sublicense Agreements

were in effect" and sublicensee "had not made any efforts to market and sell [defendant's products] outside the United States or Canada"); *see also Schrier,* 427 F.3d at 1260 (finding that reinstatement of department chair would preserve status quo "regardless of whether or not he [was] legally entitled to such reinstatement"). Because the relief plaintiff seeks would only restore the parties to their respective statuses at that time, the Court finds that a heightened burden is not applicable on the ground that a preliminary injunction would "alter the status quo."

Defendants also argue that a heightened burden applies because the preliminary injunction would afford plaintiff all the relief it could recover after a trial on the merits. The Court disagrees. As the Tenth Circuit has clarified, "[t]here is no reason . . . to disfavor a preliminary injunction simply because the plaintiff would get no additional relief if he prevailed at the trial on the merits." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247 (10th Cir. 2001). Thus, the requirement that the preliminary injunction afford plaintiff "'all the relief to which [it] may be entitled' must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone." *Id.* In this case, plaintiff seeks, among other things, to permanently enjoin Ally from engaging in business practices that compete with plaintiff. *See* Docket No. 24 at 31, ¶ 3. Plaintiff also requests a court order permanently enjoining the individual defendants from continuing to work with Ally. *See id.* at 30, ¶ 2. Because a preliminary injunction would only provide this relief on a temporary basis and could be undone by a final order after a trial on the merits, it would not afford plaintiff "all the relief" to which plaintiff may be entitled. *See Pierce*, 253 F.3d at 1248 (holding that

preliminary injunction giving tribe temporary state recognition of its registration and titles did not "afford the tribe substantially all the relief it might recover"); *Planned Parenthood of Ark. & E. Okla. v. Cline*, 910 F. Supp. 2d 1300, 1307 (W.D. Okla. 2012) (finding that, because reinstatement of contract could be undone, preliminary injunction did not award substantially all relief that could be obtained at trial).

Defendant does not argue that plaintiff seeks a mandatory injunction. Accordingly, the Court finds that the requested injunction does not fit within any of the three categories of disfavored injunctions and thus the heightened preliminary injunction standard does not apply.

## B. Preliminary Injunction Factors

### 1. Irreparable Harm

The Court begins by analyzing whether plaintiff has shown a likelihood of irreparable harm. *See First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (noting that, "because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements will be considered" (internal quotation marks omitted)). Because "[t]he purpose of a preliminary injunction is not to remedy past harm," *Schrier*, 427 F.3d at 1267, the irreparable harm inquiry focuses on whether the plaintiff has demonstrated a "significant risk" that he or she will suffer irreparable injury before a court can render a final decision on the merits of the case. *See id.*; *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). "To constitute irreparable harm, an

injury must be certain, great, actual and not theoretical." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). Further, it is "well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm" because "such losses are compensable by monetary damages." *Id.*

Plaintiff asserts two bases for a finding of irreparable harm. First, plaintiff argues that it is entitled to a presumption of irreparable harm due to defendants' misappropriation of plaintiff's trade secrets. Docket No. 25 at 16-17. To support this argument, plaintiff relies in part on *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639 (10th Cir. 2004), in which the Tenth Circuit stated that, "when the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown." *Id.* at 651. Following this rule, courts in this circuit have presumed irreparable harm where a plaintiff asserts violations of the CUTSA. *See, e.g.*, *Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*, No. 07-cv-02324-WYD-MEH, 2008 WL 2185882, at *14 (D. Colo. May 23, 2008). However, the Tenth Circuit recently clarified that irreparable harm cannot be presumed in misappropriation cases because the federal Defend Trade Secrets Act and the Colorado Uniform Trade Secrets Act "merely authorize and do not mandate injunctive relief." *First W. Capital Mgmt. Co.*, 874 F.3d at 1143. Plaintiff's first argument, that irreparable harm should be presumed based on defendants' alleged misappropriation of trade secrets, is therefore unavailing.

Plaintiff next argues that it has shown irreparable harm based on defendants'

misappropriation of plaintiff's confidential information and solicitation of plaintiff's

customers, candidates, and employees for the benefit of Ally.  Docket No. 25 at 17.

Plaintiff asserts that defendants' actions caused plaintiff to "lose goodwill with actual

and prospective customers" and candidates – a loss that cannot be remedied with

money damages.  *Id.*  To the extent plaintiff seeks to show irreparable harm based on

defendants' misappropriation of plaintiff's trade secrets, plaintiff's argument fails.  Even

assuming that plaintiff's customer information qualifies for trade secret protection under

the CUTSA or the DTSA, Mr. Hirschfeld testified that he did not retain access to

plaintiff's Outlook database or his cell phone contacts after he left DTC.  The only

evidence that defendants acquired confidential information belonging to plaintiff is Mr.

Hirschfeld's testimony that he downloaded thousands of converted resume files onto a

USB drive prior to his resignation.  However, Mr. Hirschfeld testified that he never

transferred the files to Ally's server.  In July or August 2017, Mr. Hirschfeld gave his

computer and USB drives to Mr. Rhinehart.  Both Mr. Hirschfeld and Mr. Rhinehart

testified that the devices were subsequently turned over to a third-party forensics

company for safekeeping.  Plaintiff has presented no evidence controverting this

testimony or otherwise demonstrating that defendants have retained access to plaintiff's

proprietary information.  Accordingly, plaintiff cannot show a significant risk that it will

suffer irreparable harm in the future based on defendants' misappropriation of plaintiff's

trade secrets.  *See Cargill Inc. v. Kuan*, No. 14-cv-2325-RM-MJW, 2014 WL 5336233,

at *4 (D. Colo. Oct. 20, 2014) (rejecting argument that plaintiff would be harmed absent

an injunction prohibiting defendant from using or disclosing documents taken from

plaintiff where defendant had already returned the documents pursuant to a stipulated

order).[1]

The cases plaintiff cites do not alter this conclusion. Both *Statera* and *Atlas Biologicals* were ex parte temporary restraining orders and are thus of limited precedential value for purposes of resolving plaintiff's preliminary injunction motion. *See Statera, Inc. v. Henrickson*, No. 09-cv-01684-JLK-BNB, 2009 WL 2169235, at *1, 5 (D. Colo. July 17, 2009); *Atlas Biologicals, Inc. v. Kutrubes*, No. 15-cv-00355-CMA-MEH, 2015 WL 996368, at *1 (D. Colo. Mar. 3, 2015). In addition, all four of the cases plaintiff cites are factually distinguishable. Unlike in this case, there was reason to believe that the defendants in *Statera* and *Atlas Biologicals* had retained access to and/or continued to use proprietary information belonging to the plaintiffs. *See Statera*, 2009 WL 2169235, at *3 (noting that "the evidence indicate[d] that the defendants [were] using [the plaintiff's confidential information] currently to conduct their competing enterprise"); *Atlas Biologicals*, 2015 WL 996368, at *3 (noting plaintiff's belief that defendants had "continued to utilize [plaintiff's] trade secrets, including its customer lists, to solicit business for Peak Serum"). Likewise, in *Haggard*, the court found a sufficient risk of irreparable harm where the defendant was subject to multiple restrictive covenants and admitted that, but for the litigation, he "would [have] willfully violate[d] the terms" of those agreements. *Haggard v. Synthes Spine*, No. 09-cv-00721-CMA-KMT, 2009 WL 1655030, at *14-15 (D. Colo. June 12, 2009). Moreover, the court's

_____

[1]In its motion for a preliminary injunction, plaintiff refers to ¶¶ 43-64 of the first amended complaint in support of its claim for misappropriation of trade secrets. However, none of these allegations demonstrate that defendants retained access to plaintiff's confidential or proprietary information after August 2017. *See* Docket No. 24 at 10-13, ¶¶ 43-64.

irreparable harm determination rested on a general finding that the loss of goodwill caused by the plaintiff's inadvertent disclosure of customer and product development information would not be compensable with money damages. *See id.* at *15. The court did not specifically address the likelihood that the plaintiff would disclose the defendant's trade secrets. *See id.* Finally, plaintiff's citation to *Cargill* actually supports the denial of a preliminary injunction in this case. There, the court denied the plaintiff's motion for a preliminary injunction after concluding that none of the preliminary injunction factors weighed in favor of relief. *See Cargill Inc.*, 2014 WL 5336233, at *8. In evaluating the balance of the equities, the court expressed skepticism regarding the plaintiff's assertion of irreparable harm, given the uncontroverted evidence that the defendant had already returned the plaintiff's confidential information. *See id.* at *4. The Court is faced with a similar situation in this case. Because plaintiff has failed to show that defendants have access to plaintiff's confidential or proprietary information, plaintiff cannot demonstrate a significant risk of future harm based on defendants' continued misappropriation of trade secrets. *See First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, 2016 WL 5400387, at *6 (D. Utah. Sept. 27, 2016) (finding that past use of plaintiff's trade secrets was insufficient to demonstrate risk of irreparable injury in the absence of evidence that "the use [was] continuing or threatened").

For similar reasons, plaintiff cannot establish a risk of irreparable injury based on defendants' past misappropriation of plaintiff's name, services, or operations. In support of its unfair competition claim, plaintiff alleges that "Ally, through its secret agent Mr. Hirschfeld, exploited and misappropriated DTC's business operations."

Docket No. 25 at 16. Plaintiff further asserts that Mr. Hirschfeld "transacted a significant amount of Ally business while using a DTC computer, email account, title, and candidate resumes formatted as DTC consultants, and further misrepresented the status of the Ally-DTC business arrangement in order to secretly steal work and opportunities from DTC." *Id.* Assuming these allegations have merit, they relate only to past misconduct that occurred while Mr. Hirschfeld was still an employee of DTC. Plaintiff has presented no evidence that Ally has continued to appropriate DTC's name or resources to solicit business. Nor is there evidence demonstrating ongoing confusion within the industry as to the relationship between the two companies. *See First Am. Title Ins. Co.*, 2016 WL 5400387, at *6 (finding that plaintiff did not show any ongoing, irreparable injury stemming from defendants' unfair competition, where the actions that served as the basis for the unfair competition claim had "already happened"); *see also Schrier*, 427 F.3d at 1267 ("The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without [its] issuance.").

Although plaintiff cannot establish a significant risk of irreparable harm based on defendants' past misconduct,[2] the Court finds that plaintiff faces a significant risk of

_____

[2]This finding obviates the need to address the remaining preliminary injunction factors as to plaintiff's claims for misappropriation of trade secrets, unfair competition, and breach of the duty of loyalty. As discussed above, plaintiff has made no showing of ongoing misappropriation of plaintiff's name, services, or trade secrets. And plaintiff cannot show future harm based on an ongoing breach of the duty of loyalty by Mr. Galban or Mr. Hirschfeld because defendants' duty of loyalty to DTC ended when they resigned. *See Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 493 (Colo. 1989) (noting "employee's duty of loyalty to and duty not to compete with his employer," as well as employee's "corresponding privilege to make preparations to compete after termination of his employment"); *see also id.* at 494 ("An employee's duty of loyalty applies to the

19

future injury based on Mr. Hirschfeld's continued solicitation of plaintiff's customers and candidates. Mr. Hirschfeld admitted at the hearing that he has continued to solicit DTC's customers on behalf of Ally since his resignation from DTC. He further indicated that he has no intent to stop doing so and that such solicitation activities are consistent with the terms of his employment contract. Based on this testimony, the Court finds that there is a significant likelihood Mr. Hirschfeld will continue to solicit DTC's customers before the conclusion of a trial on the merits. The Court further agrees that the harm likely caused by Mr. Hirschfeld's ongoing solicitation efforts, including loss of customers, loss of goodwill, and further erosion of DTC's competitive position in the oil and gas staffing industry, would be difficult to calculate in monetary terms. *See Dominion Video Satellite, Inc. v. Echostar Satellite* Corp., 356 F.3d 1256, 1263 (10th Cir. 2004) (discussing factors that support an irreparable harm determination, including "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products"); *Am. Family Mut. Ins. Co. v. Gustafson*, No. 08-cv-02772-MSK, 2008 WL 5377969, at *2 (D. Colo. Dec. 22, 2008) (noting that "the loss of customers (and the associated goodwill) to a unfair competitor can constitute irreparable harm"). Assuming plaintiff can establish a likelihood of success on its breach of contract claims (which would involve a showing that Mr. Hirschfeld is bound by the non-solicitation provisions in his employment agreement), the Court finds that plaintiff has demonstrated a significant risk of irreparable harm based on Mr.

---

solicitation of co-employees, as well as to the solicitation of customers, *during the time the soliciting employee works for his employer*." (emphasis added)).

Hirschfeld's solicitation of its customers.

## 2. Likelihood of Success on the Merits

Plaintiff argues that it is likely to prevail on its breach of contract claim against

Mr. Hirschfeld because Mr. Hirschfeld has continued to solicit DTC's customers and

candidates in violation of his employment agreement. As discussed above, Mr.

Hirschfeld admitted at the preliminary injunction hearing that he has continued to solicit

DTC's customers on Ally's behalf. He argues, however, that the non-solicitation

provisions in his employment agreement no longer apply due to the change in

ownership of DTC in April/May 2017.

Mr. Hirschfeld entered into an employment agreement with DTC on January 1,

2015. *See* Exhibit 2. Section 12 of the agreement provides that,

> while employed by the Company and for a one-year period thereafter,
> Employee shall not, directly or indirectly, solicit or influence or attempt to
> solicit or influence any current customer, client, vendor or supplier of the
> Company . . . to divert their business to any Competitor . . . or otherwise
> terminate its relationship with the Company for any purpose or no
> purpose.

*Id.* at 5, ¶ 12. The agreement further states that the non-solicitation provision will not

be applicable "in the event of a termination of this Agreement by the Employee without

Good Reason but because there has been a change in the current equity ownership of

the Company." *Id.* Relying on this language, defendant Hirschfeld contends that the

non-solicitation agreement is unenforceable because Mr. Sylar sold his ownership

interest in DTC to Mr. Clausen on May 1, 2017, thereby effecting a change in the equity

ownership of the company. At the hearing, both sides agreed that, given the change of

ownership, the non-solicitation provision would otherwise not be enforceable. The

Court will assume likewise. However, plaintiff argues that, because Mr. Hirschfeld breached the employment agreement prior to the change in ownership, Mr. Hirschfeld is precluded from relying on the equity ownership clause to oppose plaintiff's efforts to enforce the terms of the agreement. *See* Docket No. 25 at 12.[3]

It is well established in Colorado that "a party to a contract cannot claim its benefit where he is the first to violate its terms." *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005); *see also Scientific Packages, Inc. v. Gwinn*, 301 P.2d 719, 722 (Colo. 1956) ("The party who commits the first substantial breach of a contract is also deprived of the right to complain of a subsequent breach by the other party."). In other words, a material breach by one party to a contract relieves the other party of its performance obligations under that contract. *See Kaiser v. Market Square Discount Liquors, Inc.*, 992 P.2d 636, 641 (Colo. App. 1999) (noting that "performance under a contract is excused only by a material breach by the other party").

According to plaintiff, the doctrine of prior breach renders Mr. Hirschfeld's employment agreement enforceable despite the change in equity ownership of DTC. Although the doctrine of prior breach may excuse a party's nonperformance under a

---

[3]The Court notes that, although plaintiff appeared to make an "unclean hands" argument at the evidentiary hearing, the cases cited in its preliminary injunction motion address the separate, but overlapping, doctrine of prior breach. *See* Docket No. 25 at 13. The Court finds the doctrine of prior breach to more applicable in this case. While the unclean hands doctrine is typically invoked to bar an equitable remedy where the party seeking such relief has engaged in improper conduct, *see Salzman v. Bachrach*, 996 P.2d 1263, 1269 (Colo. 2000) ("In Colorado, the clean hands maxim dictates that one who has engaged in improper conduct regarding the subject matter of the cause of action may, as a result, lose entitlement to an equitable remedy."); *see also id.* (noting that the "clean hands doctrine is . . . devised to protect the integrity of the court"), plaintiff is using Mr. Hirschfeld's breach of the employment contract to support the granting of equitable relief.

contract, plaintiff seeks to apply the doctrine to preclude Mr. Hirschfeld from relying on a provision that does not set forth plaintiff's performance obligations but rather permits Mr. Hirschfeld to terminate the agreement in the event there is a change in equity ownership of the company. *See* Exhibit 2 at 5, ¶ 12. Plaintiff does not cite any authority – and the Court has found none – for applying the prior breach doctrine in this manner. The cases plaintiff cites stand only for the proposition that one party's contractual breach excuses the other party's obligations to perform under the contract. In *Coors*, for example, the court held that the defendant's prior breach of the insurance contract "relieved [the plaintiff] of any obligation to pay a termination penalty" upon his surrender of the insurance policy. *Coors*, 112 P.3d at 64. Similarly, in *In re Country World Casinos, Inc.*, 181 F.3d 1146 (10th Cir. 1999), the court determined that the plaintiff did not owe interest for a period in which it had justifiably withheld monthly payments on a promissory note due to the defendant's failure to satisfy a condition precedent of payment. *See id.* at 1149-52.

Because plaintiff has not shown that it is appropriate to apply the prior breach doctrine to preclude Mr. Hirschfeld from enforcing the equity ownership provision, the Court concludes that plaintiff is unlikely to succeed on the merits of its breach of contract claim. Absent an enforceable non-solicitation agreement, plaintiff also cannot demonstrate a significant risk that it will suffer irreparable harm pending the conclusion of a trial on the merits. Given these findings, plaintiff has failed to establish that it is entitled to a preliminary injunction, and the Court need not address the remaining

preliminary injunction factors.[4]

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Amended Motion and Supporting Memorandum for Preliminary Injunction [Docket No. 25] is **DENIED**.  It is further

**ORDERED** that individual defendants' request for reasonable attorney's fees and costs, Docket No. 42 at 11, is **DENIED**.

DATED March 2, 2018.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

[4]In their response to plaintiff's motion for a preliminary injunction, the individual defendants ask the Court to award them "their costs and reasonable attorneys' fees incurred in defending the preliminary injunction" but do not provide any authority allowing the Court to grant such an award.  Docket No. 42 at 11.  Accordingly, their request is denied.